## POSTON SOUEY *v.* THE STATE.

1. CRIMINAL LAW. *Defendant entitled to charge applicable to facts of case.* A defendant in a State prosecution has a right, not only to a correct charge of the general principles of law applicable to the defense relied on, but to a specific charge, if requested, of the law applicable to the particular facts of the case.

2. SAME. *Same. Threats.* Where, therefore, upon a trial for murder, the defense being justifiable homicide, it was shown that the deceased was a dangerous man and had threatened on the very day to take the life of the defendant before dark, which threats were communicated to the defendant, and it was further shown that the deceased about dusk went to where the prisoner was and made a demonstration which might reasonably lead the defendant to believe that he intended to carry out his threats, but the proof in one aspect tended to show that he had no such intention, the defendant was entitled, upon request, to a charge that if he honestly believed, upon reasonable grounds, that his life was in danger he would be justified in killing the deceased, whether the deceased went to where the defendant was to execute his threats or not.

---

### FROM CARTER.

---

Appeal in error from the Circuit Court of Carter county. NEWTON HACKER, J.

R. R. BUTLER and S. G. HEISKELL for Souey.

ATTORNEY-GENERAL LEA for the State.

COOPER, J., delivered the opinion of the court.

The prisoner has appealed in error from a judgment of conviction of voluntary manslaughter committed on the body of one William Springer. The defense relied on was and is that the killing was done under

an honest belief at the time, founded upon a reasonable ground, that it was necessary to take the life of the deceased in order to protect his own life, or save him from great bodily harm, the prisoner himself being in no fault: *Hull* v. *State*, 6 Lea, 249.

· The prisoner was a clerk in a commissary store kept to supply hands employed in the construction of a railroad. The deceased came to the vicinity about a week before the killing, seeking employment on the railroad. There is evidence tending to show that he either failed to obtain employment, or employment at such a price as he . desired to secure, and that he attributed the failure not to the manager of the work but the prisoner, the clerk. One witness introduced by the State, and another by the defendant prove the fact that on the day of the killing the deceased threw the blame upon the prisoner, accompanying his assertion with the threat that he would kill the prisoner that day. The former witness testifies that he saw the deceased about four o'clock on that day, when he, the witness, was on his way to the commissary store, who then made threats against the prisoner, attributing to him the failure to get work at a satisfactory price, and saying, with an oath and vituperative epithet, that he would kill the prisoner before sundown. Witness told the prisoner of these threats at the store. The witness went afterwards to a blacksmith shop, about 300 yards from the store, where the deceased was at work for the proprietor that day. The deceased again repeated his threats. He stepped out ·into the road, and talked loud and boisterous, cursing.

the while, and swore he · would kill defendant before dark. Witness communicated these threats also to the defendant. At four o'clock on the same evening, Mrs. Snyder, who resided with her husband about a mile from the store, rode up to the store, accompanied by her nephew, a youth of not quite 17 years of age. Their horses were hitched by the side of the road, and Mrs. Snyder was taken by the defendant into a side room, where there was a fire, the day being cold and rainy in the latter part of November, and the store being filled with railroad hands who were purchasing supplies, it being Saturday. While these persons were in the house, their horses were carried off about 75 yards into the woods, and there hitched. The same State's witness, whose testimony is given above, says in effect that the deceased took the horses from where they had been hitched, saying that he would pull off the bridles, and maybe the defendant, again using an oath and a vituperative epithet in connection with his name, "would poke his head out and he would get a chance at him." The deceased went also with the witness to his boarding-house, where the defendant boarded, and could not be induced to go to his own boarding-house. He said he would eat supper, and kill defendant. There is also some proof tending to show that the deceased knocked at the door in which Mrs. Snyder was while at the store.

The defendant's witness states that he went to the store between three and four o'clock, and found no person there. He then went to the blacksmith shop and asked deceased if he knew where defendant

was. He replied that he did not, but he intended to find him, and kill him before the sun went down. Witness went back to the store, and, finding defendant there, asked him if he knew the deceased was mad at him, and told him what he had said. The defendant replied that he did not want to have any difficulty with deceased, and would try to keep out of his way.

The blacksmith, who was also introduced as a witness by the State, proves that he had known the deceased for 23 years, but had not seen him before his recent coming to the neighborhood for 12 years. He testifies that the deceased was a dangerous man, a very dangerous man when mad, and that he told defendant in answer to a question by him whether the deceased was much of a fighter, that "when mad he was a devil, yes a legion of devils." The deceased was a powerful man, six feet two inches in height, and weighing about 225 pounds. The defendant was a young man, weighing about 145 pounds.

When it was discovered that the horses of Mrs. Snyder and her nephew had been taken off, the defendant and the nephew went out and found them. About dusk Mrs. Snyder, her nephew and the defendant left the store together, the nephew going for the horses, and the defendant and Mrs. Snyder walked along the public road in the direction of her house. After they had gone about a hundred yards, Mrs. Snyder, who was walking behind the defendant, looked back and saw deceased running down the road towards them, her nephew being a little ahead of him, riding one

horse and leading the other. . The deceased was bare headed. He had been drinking freely that day with the blacksmith, who says that he himself was drunk, but remembered all that occurred, and deceased was as drunk, or drunker. At this point the testimony of the aunt and her nephew, the only two persons present when the killing occurred, is somewhat variant.

Mrs. Snyder says that when she saw the deceased coming she moved in front of defendant; . that deceased ran against defendant, and came around to her taking her by the shoulder, and said: "I'll put you on your horse." At that time her nephew, she says, was on a line with them on the road. She told deceased that she did not want to get on her horse. He took his hand from her shoulder. She partially turned towards him, and he stepped up in front of her, and said: "I can set you on nice." The defendant then remarked: "You had better mind what you are doing." The deceased stepped back and said: "I'll fix you;" and put his right hand under his coat on his right hip pocket. "I saw his coat part to the top," says the witness. The defendant then put out his pistol, which the witness saw him cock, and fired several shots, four of which took effect. When the deceased stepped up to her the second time, the witness says her nephew was in front of them, having ridden on ahead.

The nephew's statement is that when his aunt stepped in front of the defendant, "the defendant took out his pistol, cocked it and put it under his coat on the right side. I heard the pistol click. Deceased came

up and walked around defendant, and said to Mrs.
Snyder, two or three times, I will help you on your
horse. She said, I don't want to get on my horse.
Deceased stepped back and laughed. Defendant and
Mrs. Snyder started on, and went three or four steps.
Deceased made one or two steps, and defendant turned
around, drew his pistol and shot deceased. I did not
see the pistol but heard the report. I saw deceased
throw up both hands, and go forward towards defend-
ant. Deceased had nothing in his hands." In an-
other part of his testimony this witness says: "When
deceased overtook defendant and Mrs. Snyder, he went
to the left of defendant. Defendant did not speak
that I heard. I was in ten steps." Again this wit-
ness says: "I was riding one horse and leading one.
I might have been a little in front, or by their side,
or a little behind them. We were all right along
together. I was on the right side of the road, and
they were on the left. I did not say that I was
ten steps in front of them when my aunt looked around,
and said yonder comes that man. I don't know whether
deceased had on a hat or not. I think he had on a
coat. I did not see deceased until he came up to
defendant and Mrs. Snyder. If he took hold of her,
I did not see him. I did not see him run against
defendant. I did not hear defendant say I will put
Mrs. Snyder on her horse, or the deceased say, damn
you I'll fix you, nor see him put his hand on his
pistol. Deceased started in the direction we were going.
When I last saw them they might have been touching
each other. I don't know how close they were to-

gether. I don't know whether deceased was drunk. It was dark when this happened. I don't know whether it was cloudy or not." The witness adds: "I think that if Springer had said 'damn you I'll fix you,' I was close enough to have heard him. I was looking at the parties at the time."

It does not appear that the deceased was armed. When his clothes were removed after he had been carried to the shop no arms were found. And a witness was allowed to prove, without objection, as a dying declaration of the deceased, after the attending physician told him he would die, that the deceased said: "It was horrible to be shot up that way for nothing."

In view of the animosity proved by two witnesses to have been shown by the deceased to the defendant on the day of the killing, and his repeated threats to take the defendant's life before dark, and the fact that these threats were communicated to the defendant, it seems probable that the jury would have found that the defense of justifiable homicide had been made out if they had believed the testimony of Mrs. Snyder. For her testimony does show such an overt act, coupled with the previous threats, as would have brought the case within the law of self-defense as settled by this court. The jury must therefore have given greater credence to the testimony of the nephew. Even from that testimony the defendant might well have been alarmed, after what he had heard, at finding himself approached by the deceased, bare headed, and running, and might have been justified in preparing for the worst. His testimony, moreover, is that after the de-

fendant 'and Mrs. Snyder had again started on, the deceased followed them, and was shot while going forward towards the defendant. It otherwise appears that all of the shots took effect in the front part of the deceased, showing that he was facing the defendant. The witness does not undertake to characterize or explain the act of the deceased in stepping forward after the defendant and his companion. It was, however, for the jury to say whether it was such an overt act under the circumstances as would justify the killing, and they have found that it was not.

It is obvious, however, that the facts make out a very close case, and one which required the utmost accuracy in the charge to sustain the verdict. The law of self-defense is laid down by the trial judge in his charge with entire accuracy, for the charge is made up of extracts from the opinions of this court. But, like too many charges of the trial judge, while the charge is abstractly correct, it has no reference to the facts of the particular case. It would apply to any other case of self-defense just as well as to this case. The turning point of this case, looking alone to the testimony of the nephew and the other evidence tending to show that the deceased had no intention at the time of making a personal attack on the defendant, was whether the defendant from his standpoint might not have a reasonable ground to entertain honestly a different belief. The court was asked to make a special charge, upon the facts in evidence, to bring squarely before the jury this material aspect of the case. These requests were:

"If it appears in evidence that the deceased had made threats that he would kill the defendant, or do him great bodily harm, and the threats were communicated to the defendant, and the deceased came to where the defendant was, and, either by acts or words, made any demonstration that would reasonably lead the defendant to believe that the deceased was about to carry the threats into execution, he had the right to take the life of the deceased, whether the deceased intended to carry out the threats or not."

"Or that if the deceased made threats that he would kill the defendant before sun down, or before dark, and that the threats were communicated to the prisoner, and the character of the deceased was that of a dangerous man; and that if the deceased went to where the prisoner was, and made a demonstration that would reasonably lead the defendant to believe that he intended to carry out the threats, the defendant had the right to kill him whether the deceased went to where the defendant was to carry the threats into execution or not."

We think that the parties to a State prosecution as well as the parties in a civil action, have the right not only to a correct charge of the general principles of law applicable to the character of the case, but to a specific charge, if requested, of the law applicable to the particular facts of the case. Under the peculiar circumstances of the present case, the defendant was entitled to a charge upon the point emphasized by his requests, and which was the very turning point of his defense, if not in the language of the requests, and

it need scarcely be said that a demonstration by words would not be within the rule, at any rate in such language as would plainly and squarely present it to the jury. The second request seems to be unexceptionable.

For this error the judgment must be reversed, and the cause remanded for a new trial.