# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
December 8, 2015 Session

## STATE OF TENNESSEE v. RICKY DUVIL LUNSFORD

**Appeal from the Circuit Court for Madison County**
**No. 12604     Nathan B. Pride, Judge**

_____

**No. W2014-01926-CCA-R3-CD  -  Filed April 29, 2016**

_____

A Madison County jury convicted the Defendant, Ricky Duvil Lunsford, of attempted voluntary manslaughter and employing a deadly weapon during the commission of a dangerous felony.  On appeal, the Defendant contends that the trial court erred when it: (1) failed to properly instruct the jury; (2) excluded an email from the Defendant to the victim about the decline of their marriage; (3) prevented the Defendant from testifying about the victim's prior aggressive tendencies; and (4) excluded evidence of the victim's prior domestic assault charge.  After a thorough review of the record and the applicable law, we conclude that the trial court erred when it failed to instruct the jury as to self-defense.  We reverse the judgments of conviction and remand for a new trial.

**Tenn. R. App. 3 Appeal as of Right; Judgments of the Circuit Court Reversed and Remanded**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which THOMAS T. WOODALL, P.J. and ALAN E. GLENN, J., joined.

C. Mark Donahoe, Jackson, Tennessee, for the appellant, Ricky Duvil Lunsford.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; Jerry Woodall, District Attorney General; and Robert Radford, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

This case arises from an altercation on April 29, 2012, which occurred between the Defendant and his wife at the time of these events, Mary Lou Jean Lunsford ("the victim").  A Madison County grand jury indicted the Defendant for attempted first degree

premeditated murder, employing a deadly weapon during the commission of a dangerous felony, aggravated kidnapping, and aggravated assault.

At trial, the parties presented the following evidence: Matthew Dotty, a Madison County Sheriff's Department deputy, testified that on April 29, 2012, at a little after midnight, he was conducting a traffic stop at a Golden Gallon gas station when he heard gun fire. He said that he "took cover" and then looked in the direction of the gun fire where he saw a male firing a weapon in the parking lot of a bar, The Tap Bar & Grille, located across the street from the gas station. He recalled that he also saw a female, wearing a green shirt, ducking and running eastbound. He stated that the shooter was firing to the east and then patrons began running out of the bar.

Deputy Dotty testified that he drove to the Tap parking lot where it appeared that the shooter had surrendered to Deputy Mark Taylor and a Jackson Police Department officer. Deputy Dotty estimated that the shooter fired ten shots.

Mark Taylor, a Madison County Sheriff's Department deputy, testified that on April 29, 2012, he was engaged in a traffic stop at a Golden Gallon when he heard gunshots coming from across the street. Deputy Taylor said that in the parking lot of The Tap, a local bar, he observed a cloud of smoke, several people, and "chaos." Deputy Taylor ran across the street and a woman told him that "somebody had been shooting." She then pointed out the shooter who stepped out from behind a vehicle with his hands in the air. Deputy Taylor said that, with his gun drawn, he ordered the suspect to the ground and then handcuffed him. He stated that the suspect, whom he recognized, did not have a gun on his person at the time he was taken into custody.

On cross-examination, Deputy Taylor testified that he knew the Defendant because they had worked together. Deputy Taylor stated that, in his work with the Defendant, he had never known the Defendant to use "excessive force" or be "overly aggressive."

Lanonda Jernigan, the director of central dispatch for the police and fire department in Jackson, testified that she had maintained 911 recorded calls for at least four years. She identified a copy of a 911 recorded call from April 29, 2012, at 12:21 a.m., which was played for the jury. On the recording, a man identified himself as the owner of The Tap Bar & Grill. He stated that a man he identified as the former Sheriff of Henderson County had entered the bar with a gun, pointed it at his ex-wife and pushed her out of the front door. He described the Defendant as wearing a green shirt and a hat. As he spoke with the dispatcher, gunshots could be heard in the background. He stayed on the line with the dispatcher until authorities arrived and took the Defendant into custody.

Shane Roberson testified that in April 2012, he worked as a security officer at The Tap Bar and Grill. Mr. Roberson recalled that on the night of April 29 the victim was seated at the first table to the left inside the front door of the bar with Jeremy and Kim Crocker, the bar owners. Mr. Roberson said that he was positioned at the front door and saw the Defendant enter. Mr. Roberson estimated that the Defendant entered the bar thirty to forty-five minutes before the shooting occurred. The victim was standing near Mr. Roberson while texting the Defendant. He said that she was laughing and said, "He acts like he don't see me." The victim asked Mr. Roberson if her husband, the Defendant, could have his chair, and he agreed.

Mr. Roberson testified that the Defendant walked over to the table, and Mr. Roberson offered the Defendant his chair. He said that the Defendant gave him "a blank stare" and then grabbed the victim by her arm. The Defendant said to the victim, "let's go," and the victim responded, "I'm not going anywhere." Mr. Roberson recalled that, in response, the Defendant said, "yeah, you are," put a gun against the victim's chest, and pushed her out of the door. Mr. Roberson recognized the gun that the Defendant held as a semi-automatic pistol.

Mr. Roberson testified that he followed the Defendant and the victim out the door and watched as they walked to the end of the building. The Defendant "holstered" his weapon, and the victim "jerked free" from the Defendant's grip and ran. Mr. Roberson said that the Defendant took two or three steps, pulled out his gun, and fired his weapon approximately ten times at the victim. Mr. Roberson recalled that the Defendant's gunshots came "rather close" to the victim but did not hit her.

Mr. Roberson testified that Madison County Sheriff's deputies, who had been conducting a traffic stop across the street, came to the bar parking lot with their weapons drawn. The Defendant dropped his gun, put his hands up, and lay down on his chest. Mr. Roberson said that he went to the area where the victim had fled and found her crouched down holding onto the tire of a vehicle. He said that she was crying "hysterically" and that it took him three or four minutes to convince the victim to let go of the tire.

On cross-examination, Mr. Roberson testified that, prior to the shooting, the victim frequented the bar weekly and "most of the time" was without her husband, the Defendant. Mr. Roberson agreed that he did not pat the victim down when she entered the bar on April 29 nor did he ever see the police search her person.

Jeremy Crocker, owner of the the Tap Bar and Grill, testified that he arrived at the bar at around 10:00 p.m. and the victim arrived later. Mr. Crocker said that he saw the

3

Defendant standing at the bar approximately ten minutes before the interaction between the Defendant and the victim occurred. He then turned his attention to the band that was playing. A few minutes later, he turned around and saw the Defendant and the victim "exiting the building in a hurry." Mr. Crocker looked out the window and watched the Defendant escorting the victim down the sidewalk. He did not see a gun but saw that if the victim slowed her pace, the Defendant would shove her.

Mr. Crocker testified that he called 911 because "somebody" had said there was a gun and there was "a crowd of people" at the bar that night. Mr. Crocker recalled that, as soon as "somebody said gun," he retrieved his gun and his cell phone from his office. He said that, after retrieving these items from his office, he stepped outside and observed the Defendant fire his weapon. He said that the victim was approximately a car "width" away from the Defendant at the time and that she began screaming and running and then "ducked" behind a car. Mr. Crocker recalled that the Defendant fired his weapon twelve to fourteen times. He said that sheriff's deputies, who were close by, responded very quickly and diffused the situation.

Mr. Crocker testified that he had never seen the victim with a gun. After the shooting, he found the victim was behind a car on the passenger side holding the back tire. He described the victim as "in shock" and "hysterical." Mr. Crocker testified that, during the shooting, he feared that either he or his wife would be injured.

Kim Crocker testified that she had been friends with the victim for ten years. Ms. Crocker recalled that on the night of April 29 the victim entered the bar at around 11:00 p.m. and joined Ms. Crocker at a table by the front door. Ms. Crocker said that she was sitting with her back to the door and did not see the Defendant enter, but a friend came by the table and told them that the Defendant was at the bar. Ms. Crocker said that the victim texted the Defendant telling him to join them at the table for a drink. The Defendant approached the table, and Mr. Roberson stood up and offered his seat to the Defendant. The Defendant stood behind the victim and pulled her up from the stool she was sitting on, almost turning the stool over. Ms. Crocker turned to see what the Defendant was doing and saw that he was holding a gun against the victim's back and pushing her out the front door. She said that the look on the Defendant's face "frightened" her "a little bit."

Ms. Crocker testified that she could not hear if the Defendant spoke to the victim, but that she did hear the victim asking, "What's wrong? What are you doing?" Ms. Crocker said that she told her husband to call 911 and then went outside to "make sure" the Defendant did not hurt the victim. She said that her concern at the time was that the Defendant would hit the victim, not that he would shoot her. Ms. Crocker said that she exited the bar and stood by the car bumpers in the parking lot just outside the front door

4

of the bar and looked down the aisle to where the victim and the Defendant stood. In what seemed like "just seconds" she heard gunfire and observed the victim running toward her, ducking, with her hands behind her head before disappearing between two of the parked cars. Ms. Crocker said that Mr. Crocker shoved her behind a car tire and told her to "stay down." She remained behind the car tire until the gunfire had ceased and she heard the deputies pulling into the parking lot.

Ms. Crocker said that, after the deputies arrived, she went to check on the victim and found her "tearful" and "completely in shock." Ms. Crocker said that, to her knowledge, the victim did not have a gun or a knife with her that night.

On cross-examination, Ms. Crocker testified that she was "positive" that Mr. Crocker did not have a gun when they stepped outside to keep an eye on the victim. Ms. Crocker confirmed that patrons are not searched before entering the bar.

Barbara Raines testified that she and a friend had gone to The Tap Bar and Grill on the night of April 29, 2012, to dance. She did not, however, get to dance because when she pulled in to the parking lot of the bar and parked the car, she observed a woman running and screaming and then she heard gunfire. She identified the Defendant as the shooter. She said that she saw the Defendant aiming at the victim and firing his gun. She and her friend ducked inside the car until the gunfire ceased and she heard sirens. When she sat up, she saw the Defendant on his knees with his hands up in the air.

On cross-examination, Ms. Raines testified that, although the Defendant aimed at the victim, based upon where she parked her car, she was "in the line of fire."

The victim testified that she and the Defendant were married on June 26, 2010, and the marriage lasted approximately two years. The victim stated that the Defendant filed for the divorce and that the divorce was final in August 2012. During their short marriage, the Defendant spent much of the time in Afghanistan working as a private contractor. The victim described the marriage as "troubled." One of the issues in the marriage was the care-taking of the Defendant's eight-year-old daughter. The victim explained that the Defendant's child engaged in tantrums, making it difficult to care for her. Due to these tantrums, the victim contacted the Defendant in Afghanistan and told him he needed to return to the States to care for his daughter. The Defendant arrived back in Tennessee two or three weeks later on February 14, 2012.

The victim testified that, upon the Defendant's return, "it worked" for a few days but then she "just couldn't take it." She stated that she was, "just ready to get a divorce and [she] did not want to raise this child." The victim asked the Defendant to leave the residence, and he rented an apartment and moved out of the marital residence. She said

that she and the Defendant stayed in communication during this time and reconciled "somewhat." She said that she would meet with him during her lunch break and that she stayed at his apartment a few times but, ultimately, concluded that "it was just not going to work out."

The victim testified about the events of April 29, 2012. She said that the Defendant came to her house to have dinner with her, her daughter, and grandchild. She confirmed that both she and the Defendant drank alcohol at this time. She said that she knew the Defendant to take Xanax but was uncertain if he had taken Xanax that day. She estimated that the Defendant left her residence at around 10:00 or 10:30 p.m. After the Defendant left, the victim went to the Office Lounge, a bar, and consumed one beer. While at this bar, the Defendant called her and invited her to his apartment. She agreed she would come over to his apartment a little later.

The victim testified that she then went to The Tap Bar and Grill to see her friends, Mr. and Ms. Crocker. While at this bar, the Defendant texted to tell her he was "fixing to be over there." Later he texted, "[W]here you at?" The victim said that she responded that she was at The Tap Bar and Grill. A few minutes later a friend told the victim that the Defendant was at the bar. The victim had not noticed the Defendant enter the bar but, after her friend told her, she saw the Defendant standing by the bar. The victim texted the Defendant, "I'm here" and "[Y]ou know where I'm at." She said that she sent a text telling the Defendant to "look up at the front door."

The victim testified that, at this point in the evening, she was not angry with the Defendant nor did she have any knowledge of him being angry with her. She asked Mr. Roberson, who was seated next to her, if the Defendant could have his seat, and he agreed. The Defendant walked over to the table where the victim was sitting, Mr. Roberson stood up to give the Defendant his chair, and the Defendant grabbed the victim and put a gun to her "side." The victim said that, as the Defendant did this, he told her, "[Y]eah. Come on. Get up. We're going." The victim asked the Defendant "what's going on" as they walked out of the bar. At the end of the sidewalk, the victim asked, "[W]hat's wrong" and the Defendant responded, "I think I'm f**king going to kill you, b**ch." Upon hearing this, the victim "took off."

The victim testified that she believed the Defendant would kill her. The victim screamed as she ran from the Defendant and ducked between two cars before hearing gunshots. The victim stated that as far as her memory of the events, "from the sidewalk down I am blank." The next day she had bruising on her lower back, for which she sought medical treatment. The victim said that she owned a knife but did not have it with her on the night of the shooting. The victim also agreed that she owned a .38 revolver and an ankle holster; however, she stated that she did not have either with her that night.

6

She explained that she had only worn the ankle holster twice because she did not "like the way it feels." The victim denied threatening the Defendant that night.

On cross-examination, the victim first denied telling the Defendant that she would come over to his apartment but, upon further questioning, agreed that she did tell him she would come over to his apartment and then did not. The victim agreed that she owned "several" guns and had a valid handgun carry permit. The victim agreed that "no less th[a]n two weeks prior to this incident . . . the police had been call[ed] by [the Defendant] to [her] residence because of an issue that was going on then." She further agreed that the Defendant did not try to harm her during that incident.

The victim testified that she had not been drinking "most of the day" on April 29, 2012. When provided with prior testimony from a hearing, the victim agreed that she had been drinking most of the day. The victim confirmed that she texted the Defendant inviting him to sit with her and directed him to the table by the door. When provided with a copy of the text messages, the victim read the following text message exchange from the bar that night aloud:

| The victim: | [Y]ou got to be kidding me. |
| The Defendant: | No. |
| The victim: | [Y]ou better look to the door. |

The victim agreed that the Defendant had his back to her at the time of the text exchange and that the bar was very crowded that night. She agreed that she did not attempt to go over to the Defendant at any time.

The victim testified that she and the Defendant exited the bar and walked to the right approximately 130 feet down the sidewalk to where the Defendant was parked. The victim agreed that the Defendant never tried to force her into his truck and that he remained on or near the sidewalk during the entire incident. The victim agreed that the Defendant never chased her or attempted to find her hidden between the cars.

The victim testified that, two days after the shooting incident, she went to the Defendant's apartment and knocked on the door. She agreed that she had her gun with her but stated that the gun was in her vehicle. When the Defendant did not answer the door, the victim left and was shortly thereafter stopped by the police who found her gun in the vehicle. The victim agreed that she was not searched on the night of the shooting. The victim could not recall calling the Defendant "numerous times" following the shooting incident and the Defendant not answering her telephone calls. The victim

7

agreed that she called Jeff Lewis and told him that she felt "awful about what happened," and that she did not want "to get [the Defendant] into any trouble." She agreed that she also told Mr. Lewis that she had known the Defendant a long time and knew he would "never intentionally try to hurt [her]." The victim agreed that on the night of the shooting she told the police that the Defendant had "never threatened [her] in no shape, form or anything."

The victim testified that the Defendant was a private contractor assisting and training special forces in close combat weapon use. She agreed that the Defendant had "fired countless numbers of rounds" and was an "excellent shot." The victim agreed that she told the police that if the Defendant had "wanted to shoot her, he would have." The victim agreed that she never told the police about the bruising that she testified about on direct examination and that there were no pictures of the bruising. The victim stated that she was remarried and agreed that this was her second marriage to her current husband. She explained that she had been married to him before her marriage to the Defendant and remarried him after she divorced the Defendant. The victim denied being convicted of domestic assault during her first marriage to her current husband for trying to run over him with a truck.

The victim agreed that the Defendant only fired his gun after she was between cars where she could not see him.

Cerbinia Braswell, a Tennessee Bureau of Investigation forensic scientist, testified as an expert witness in the field of ballistics. Special Agent Braswell testified that she had examined twelve cartridge cases recovered in this case and determined that all twelve were fired from the Defendant's Glock .40 caliber semiautomatic pistol, which was also recovered the night of the shooting. Special Agent Braswell also examined a bullet jacket recovered in this case. She stated that the bullet jacket had the same class characteristics as the Glock pistol but, because it was not "marked as well," she could not conclusively say that the bullet jacket was fired from the Defendant's pistol. Finally, Agent Braswell examined a fired .40 caliber bullet but due to "the type of rifling" was unable to conclusively say that the Defendant's gun fired the bullet.

James Mullins, a Jackson Police Department officer, testified that he assisted in the April 29, 2012 investigation at The Tap Bar and Grill. Officer Mullins recalled that, at the scene, a loaded revolver wrapped in a handkerchief was removed from the Defendant's left, rear pocket. Officer Mullins stated that officers also recovered twelve spent shell casings and a Glock, Model 22, .40 caliber semiautomatic pistol at the scene.

John Chew, a Jackson Police Department officer, testified that on April 29, 2012, he responded to a shooting incident at The Tap Bar and Grill. He confirmed that his

report stated that two guns were recovered: a Glock, Model 22, and a Smith and Wesson .38 that the Defendant had placed on the ground. Officer Chew stated that, once the Defendant had been transported to the jail, officers found two magazines on his person. Officer Chew confirmed that bullets from the shooting damaged three vehicles: a 2004 Ford Crown Victoria, a 2002 Ford Explorer, and a 2001 Nissan Maxima.

For the Defendant, Edmond Cepparulo, a Bethel University criminal justice adjunct professor, testified as an expert witness in the field of firearms and tactics. Defense counsel provided Mr. Cepparulo with a hypothetical which involved the Defendant in a crowded bar when he received a text message from the victim, and then saw her across a crowded room and he perceived a threat. Based upon this scenario, Mr. Cepparulo stated that the Defendant would have been at a "tactical disadvantage" due to his distance from the exit, and therefore, it "could have put him at a higher level of alertness to a threat." Mr. Cepparulo further opined that an individual anticipating danger would likely have a round chambered in a weapon. The Defendant's act of putting his weapon away after exiting the bar was an indication that he no longer perceived a threat. Defense counsel posed another scenario where the victim pulled a knife out and asked Mr. Cepparulo what the "correct response" to this hypothetical would be. Mr. Cepparulo responded that if the Defendant believed there was an imminent threat of serious bodily injury or death, the appropriate response would be to draw a weapon and eliminate the threat.

Mr. Cepparulo testified that he had previously worked with the Defendant through law enforcement in Tennessee and military work overseas. He recalled that in 2006-2007, the Defendant was working in Baghdad training police officers while he was at a base southeast of Baghdad. The Defendant later transferred to the same base as Mr. Cepparulo for two or three months before returning to the States. Based upon their work experience together, Mr. Cepparulo knew the Defendant to be "excellent with a handgun and also with a long gun." He stated that he had "high confidence" that the Defendant would successfully eliminate any threat within five or ten feet, stationary or moving.

On cross-examination, Mr. Cepparulo agreed that there is nothing "threatening" about a hypothetical where the victim sends a text to the Defendant telling him to look toward the door and he sees the victim sitting with another woman. He stated that he, likewise, did not see a threat in a situation where the Defendant approached the table where the victim was seated and someone stood to offer him a seat. He then explained that a perceived threat may not actually be a threat but only a product of an individual's mind. Mr. Cepparulo stated that there had been many times during his thirty-three years of service as a police officer that he perceived a threat, pulled his weapon, but did not shoot someone.

9

On redirect-examination, Mr. Cepparulo testified that during the time he and the Defendant had worked together he had never seen the Defendant act "overly aggressive."

Jeff Lewis testified that he and the Defendant had been friends since childhood. He confirmed that he was aware of the incident that occurred at The Tap Bar and Grill and that the victim called him several days after the incident. During the conversation, the victim expressed "sincere" concern that the Defendant would "be okay" and not "get in trouble." Mr. Lewis said that the victim appeared to be "very upset that it happened." Mr. Lewis said that, from the course of the conversation, he had the impression that the victim knew the Defendant would never do anything to intentionally harm her. Mr. Lewis described the Defendant as a "gentle giant" and stated that he had never seen the Defendant instigate "trouble."

Richard Green testified that in 2003, he and the Defendant were in Afghanistan training the Afghan Border Police. Mr. Green described the Defendant's abilities as "[excellent]" and described him as "[l]evel headed." He further stated that the Defendant was "[p]robably the best pistol shot" at the compound. Due to their location near the Pakistani border, Mr. Green said that "[t]here was always a threat" and the men were "always on alert."

Mark Lovell, a Newton County Sheriff's Department deputy sheriff, testified that he had previously worked as a SWAT and anti-terrorism instructor in the Middle East. He stated that he was a certified master instructor for firearms through the Department of Justice. Mr. Lovell said that he worked with the Defendant training border patrol officers in Afghanistan. He said that he had also worked with the Defendant previously in Iraq when the Defendant was the firearms instructor for the Baghdad Police College. Mr. Lovell recalled that he and the Defendant won a shooting competition, emphasizing safety, against "the Seals and the Rangers and the Special Forces."

The Defendant testified that he was fifty-four years old at the time of trial and had been a certified police officer for the past thirty years. He was elected to three terms as the Henderson County Sheriff but, before starting his third term, he accepted a position overseas with a specialized unit designed to advise, assist, mentor, and train members of the Iraq and Afghan forces. The Defendant recounted his extensive military work and experience. He said that during his last service, he learned that his ex-wife had "beaten" his daughter, who was now in state custody. He immediately began making arrangements to return to the States, but he asked the victim to care for his eight-year-old daughter until he could arrive, and she agreed.

The Defendant testified that he returned to their marital residence in February 2012, but that he had sent an email to the victim in October 2010, telling the victim he

10

wanted a divorce. The Defendant stayed with the victim at her residence for eight days before she told him "she would not raise [his] kid and for [him] to take her and get the - - - - out of her house." The Defendant's daughter was asleep at the time, and so he asked if he could take his daughter the next day, and the victim agreed. The next day when the Defendant arrived at the victim's house, he found his daughter outside in the rain and the victim "throwing [his daughter's] stuff in the yard." He and his daughter moved into an apartment and, ultimately, a court returned custody of his daughter to his ex-wife after she had completed treatment. At this point, the Defendant planned to return to Afghanistan and told the victim this during the day leading up to the shooting at the bar.

The Defendant testified that he was to fly out of Memphis on the Thursday following the shooting incident. He recalled that in the hours leading up to the shooting he had dinner at the victim's house with the victim, her daughter, and her granddaughter. While there, the Defendant drank four, two-ounce Crown Royal with Coke drinks and three beers. As the sun was setting, the Defendant told the victim about his plans to return to Afghanistan and the victim became "irate." The Defendant said that he went into the bedroom, laid down, and fell asleep. Later the victim entered the room intoxicated and was "falling on stuff," yelling and screaming. The Defendant said that he got up and went home. As he exited the house, the victim apologized, telling him that she would follow him home where they could stay together.

The Defendant testified that, when the victim did not arrive at his apartment, he called her, and she told him she would be there in thirty minutes. He grew concerned that she had been in a car accident or arrested due to her intoxication, and so he called her again. The victim told the Defendant she was at The Tap Bar and Grill and told him to come get her. When the Defendant arrived, he did not see her so he sent her a text message stating that he was in the bar. The Defendant agreed that he had two weapons on his person at that time because he "always" carried his weapons. The Defendant denied going to the bar with any intent to harm the victim.

The Defendant testified that he ordered a beer and then received a text message from the victim indicating for him to look at the door. His back was to the door at the time, but he turned to see Mr. Crocker and Mr. Roberson, both armed, and Mr. Roberson in "a fighting stance." He recalled that the victim was sitting between the two standing men with a "Cheshire cat" grin. The Defendant walked through the crowded bar, perceiving some threat from the two men. He approached the victim and told her to step out of the bar. Based on his eye contact with the men, he believed "something was fixing to happen." He recalled that someone grabbed him from the left side, knocking him off balance. He could see Mr. Crocker approaching from the left side, so he chambered a round in his gun, and the victim asked why he had the gun. He said that he told her, "Just let me get out of here. Let's get out the door."

11

The Defendant testified that he and the victim exited through the front door, took two steps, and he put his gun away. He told the victim that he was going home and began walking down the sidewalk. The victim tried to get in front of the Defendant and he told her to leave him alone. He said the victim was intoxicated and mumbling when she pulled out a "little clip knife" and tried to open it. The Defendant stepped around the victim and laughed at her, causing her to become angry.

The Defendant testified that during his relationship with the victim, he knew her to carry a gun in an ankle holster. The Defendant continued down the sidewalk toward his truck when he saw the victim "squat" down between two cars and reach for her leg. The Defendant believed the victim was reaching for the pistol she kept in the ankle holster and saw the gun as she attempted to retrieve it. The Defendant turned to his right and fired four "warning" rounds and then turned back to see the victim was gone. At this point he saw Mr. Crocker walking toward him, the Defendant surveyed the area, stepped out and fired the remaining shots and everyone ran back inside the bar. The Defendant said that when he arrived at the bar he saw the deputies across the street and knew that they would respond to the gunfire.

The Defendant testified that, when he saw the victim's gun, he chose not to shoot her, believing the "warning shots" would alleviate any conflict. He stated that no one was in the line of fire and that he knew there was no one in the vehicles he shot because he had noticed the empty cars on his walk out of the bar. The Defendant denied that he ever shot "at" Mr. Crocker or the victim. He said that, if he had, they would be dead. When the Defendant saw the sheriff's deputy coming across the road, he removed the magazine from his weapon and placed the weapon and the magazine on the back of his truck. He also placed the .38 pistol he carried in his back pocket onto the back of his truck. He then got down on his knees and placed his hands in the air. He stated that he provided full cooperation with the officers at the scene.

The Defendant testified that, following the shooting, his attorney told him not to have any contact with the victim, and he understood he was under a "no contact order." The victim, however, repeatedly attempted to make contact with him. The victim also went to his apartment after midnight a couple days after the shooting. The Defendant, through the kitchen window, observed the victim knocking on his door with her left hand. Knowing that she is right-handed, he tried to see what she was holding in her right hand. He stated that, because he could not see what she was holding in her right hand, he did not open the door. The victim then proceeded to throw wood chips at the bedroom window. The Defendant called the Sheriff's Department, and deputies stopped the victim in her vehicle a short distance from the Defendant's apartment. Deputies recovered a gun from her vehicle.

12

The Defendant testified that two weeks before "the incident" he had called the police in reference to threats the victim had made to the Defendant in his residence. He said he asked the victim to leave because she "started to get drunk." In response, the victim told him, "I'm going to get you F-ed," and then began walking toward the front door before turning around, walking back toward him and stating, "[N]o, I'm going to f**king kill you. I'm going to get you. You watch." The Defendant denied having ever "fired a shot in anger." He stated that he had only fired his weapon in defense of himself or in defense of someone else. The Defendant reiterated that he had not gone to the bar with any intent to harm the victim. He stated that, if the victim had not reached for her weapon, he would have never fired his gun.

Dr. Lynn Zagger, a licensed psychologist, testified as an expert witness in the field of clinical psychology. She explained that, in her work, she conducted mental competency evaluations for people facing criminal charges and that she had evaluated the Defendant. Dr. Zagger stated that she made clear to the Defendant when she met with him that he was not meeting with her for treatment purposes but rather for evaluation. She stated that she interviewed the Defendant on February 20, 2013, June 25, 2013, July 16, 2013, and November 14, 2013. She stated that, in evaluating the Defendant's competency, she not only interviewed the Defendant and administered a personality inventory, but she also reviewed documents related to the criminal investigation.

Dr. Zagger testified that her recommendation to the trial court was that the Defendant was competent. In determining the Defendant's mental condition at the time of the offense she diagnosed the Defendant with Post Traumatic Stress Disorder ("PTSD"). She stated that, in her opinion, the PTSD compromised the Defendant's ability to function at the time of the offense and interfered with his cognition. Dr. Zagger explained that someone with PTSD had undergone a "very significant trauma" causing the individual to experience "intense fear, helplessness, [and] hopelessness." Dr. Zagger said that persons suffering from PTSD may experience hyper-vigilance. This causes the person to be concerned that something is there that is going to seriously affect or harm them. She had not recommended hospitalization because she did not consider the Defendant "at significant risk of hurting himself or anybody else."

Dr. Zagger testified that the "triggering event" for the Defendant's PTSD was likely on June 8, 2007, when he was in hostile territory overseas. The Defendant relayed to her an incident when he was sitting next to his friend eating lunch and "all of a sudden somebody came up" and shot his friend in the head. Dr. Zagger testified that, while in the bar on April 29, 2012, the Defendant believed he was being ambushed and felt "significantly threatened." She said his responses were trained responses focused on getting himself to safety.

13

On cross-examination, Dr. Zagger testified that she not only listened to what the Defendant said during the interviews but also observed the manner in which he spoke and his consistency. She said that the Defendant was "extremely consistent" in terms of what he told her about the incident.

On redirect examination, Dr. Zagger confirmed that she concluded her evaluation in this case in November 2013, the month before the trial. She acknowledged that the Defendant had not sought treatment for PTSD, explaining that "something" would occur soon but "[u]nder the circumstances the timing was not optimal."

In rebuttal, the State called Tommy Ferguson, a Jackson Police Department officer. When Officer Ferguson arrived at The Tap Bar and Grill in response to the shooting, he found the victim seated in a chair by the front door. Due to the level of noise in the bar, Officer Ferguson escorted the victim to his patrol car and later transported her to the Criminal Justice Center to speak with an investigator. Before transporting the victim, the officer frisked her for weapons and found none. Officer Ferguson said that the victim was not wearing an ankle holster at the time.

On cross-examination, Officer Ferguson testified that he did not file a report in this case. He stated that he did not know how many people had had contact with the victim before he arrived. He agreed that the bar was still full of people when he arrived. Officer Ferguson could not recall what the victim wore that night or if she had any identifying tattoos. He agreed that, had he made a report of his role in the investigation, he likely would have included this information.

Following this evidence, the jury convicted the Defendant of attempted voluntary manslaughter, and employing a firearm during the commission of a dangerous felony. The jury acquitted the Defendant of the remaining charges. At a subsequent sentencing hearing, the trial court sentenced the Defendant as a Range I offender to three years supervised probation for the attempted voluntary manslaughter conviction and six years of incarceration for the employment of a deadly weapon conviction.

## II. Analysis

On appeal, the Defendant contends that the trial court erred when it: (1) failed to properly instruct the jury; (2) excluded an email from the Defendant to the victim about the decline of their marriage; (3) prevented the Defendant from testifying about the victim's prior aggressive tendencies; and (4) excluded evidence of the victim's prior domestic assault charge.

14

## A. Jury Instruction

The Defendant asserts that the jury instruction regarding the charge of employing a firearm during the commission of a dangerous felony was erroneous, and the trial court committed plain error when it did not provide an instruction on self-defense.

A trial court has the duty, in criminal cases, to fully instruct the jury on the general principles of law relevant to the issues raised by the evidence. *See State v. Burns*, 6 S.W.3d 453, 464 (Tenn. 1999); *State v. Harbison*, 704 S.W.2d 314, 319 (Tenn. 1986); *State v. Elder*, 982 S.W.2d 871, 876 (Tenn. Crim. App. 1998). "Nothing short of a 'clear and distinct exposition of the law' satisfies a defendant's constitutional right to trial by jury." *State v. Phipps*, 883 S.W.2d 138, 150 (Tenn. Crim. App. 1994) (quoting *State v. McAfee*, 737 S.W.2d 304, 308 (Tenn. Crim. App. 1987) (quoting *Strady v. State*, 45 Tenn. 300, 307 (1868))). In other words, the court must instruct the jury on those principles closely and openly connected with the facts before the court, which are necessary for the jury's understanding of the case. *Elder*, 982 S.W.2d at 876. Because questions of the propriety of jury instructions are mixed questions of law and fact, our standard of review here is *de novo*, with no presumption of correctness. *State v. Rush*, 50 S.W.3d 424, 427 (Tenn. 2001); *State v. Smiley*, 38 S.W.3d 521, 524 (Tenn. 2001).

When reviewing jury instructions on appeal to determine whether they are erroneous, this Court should "review the charge in its entirety and read it as a whole." *State v. Hodges*, 944 S.W.2d 346, 352 (Tenn. 1997) (citing *State v. Stephenson*, 878 S.W.2d 530, 555 (Tenn. 1994)). The Tennessee Supreme Court, relying on the words of the United States Supreme Court, has noted that:

> [J]urors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might. Differences among them in interpretation of instructions may be thrashed out in the deliberative process, with commonsense understanding of the instructions in the light of all that has taken place at the trial likely to prevail over technical hairsplitting.

*Id.* (quoting *Boyde v. California*, 494 U.S. 370, 380-81 (1990)). A jury instruction is considered "prejudicially erroneous," only "if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." *Id.* (citing *State v. Forbes*, 918 S.W.2d 431, 447 (Tenn. Crim. App. 1995); *Graham v. State*, 547 S.W.2d 531, 544 (Tenn. 1977)). Even if a trial court errs when instructing the jury, such instructional error may be found harmless. *State v. Williams*, 977 S.W.2d 101, 104-05 (Tenn. 1998).

### 1. Jury Instruction on Employing a Firearm

15

The Defendant argues that the trial court's improper instruction to the jury caused confusion and that "Counsel was not afforded an opportunity to review the jury charge or verdict form prior to the Court instructing the jury." The State responds that the Defendant has waived this issue because the Defendant participated in the creation of the jury charge and, therefore, had the opportunity to raise any challenges to the jury instruction and did not do so. Alternatively, the State argues that any error in the jury charge was harmless.

At trial the following jury instruction as to employing a firearm during the commission of a dangerous felony was given to the jury:

Any person who [employs] a firearm during the commission of a dangerous felony is guilty of a crime.

For you to find the defendant guilty of this offense, the state must have proven beyond a reasonable doubt the existence of the following essential elements:

[Part A:

(1)    that the defendant possessed a firearm;

and

(2)    that the possession was with the intent to go armed during the commission of or attempt to commit (ATTEMPTED FIRST DEGREE MURDER or ANY LESSER INCLUDED FELONY.]

[Part B:

(1)    that the defendant employed a firearm;

and

(2)    that the employment was during the commission of or attempt to commit] (ATTEMPTED FIRST DEGREE MURDER or ANY LESSER INCLUDED FELONY

and

16

      (3)     that the defendant acted either intentionally, knowingly or recklessly.]

At the motion for new trial hearing, the Defendant argued that the jury was improperly charged because the trial court did not define "dangerous felony." Instead of listing each of the applicable offenses the trial court inserted "ANY LESSER INCLUDED FELONY" even though some of the lesser included offenses, such as attempted criminally negligent homicide or attempted reckless homicide, are not a "dangerous felony" pursuant to Tennessee Code Annotated, section, 39-17-1324(i)(1). Both the State and the trial court referenced a meeting wherein the defense, the State, and the trial court reviewed the charge "in detail," and the Defendant's silence as to this issue during the review. Specifically, the trial court stated, "I gave every opportunity for both sides to look at the jury instructions, and I believe everybody looked at it and made suggestions. In fact, we made some changes that day."

As the State correctly notes, errors in the jury instructions may be waived. *See* Tenn. R. Crim. P. 30(b); s*ee also*, *State v. Robinson*, 146 S.W.3d 469, 509 (Tenn. 2004). In this case, the trial court should have instructed the jury as to the specific lesser included offenses to be considered. The Defendant, however, failed to object to the trial court's instruction and thus waived the issue. Furthermore, even considering the merits of the issue, the error is harmless because the jury convicted the Defendant of attempted voluntary manslaughter, an offense that is statutorily defined as a "dangerous felony" pursuant to Tennessee Code Annotated, section, 39-17-1324(i)(1)(C), (M). This issue is without merit.

## 2. Self-Defense Instruction

The Defendant argues that the trial court erred when it failed to instruct the jury on self-defense. The State responds that the Defendant never requested a self-defense jury instruction and the trial court did not commit plain error by omitting the instruction.

Self-defense is defined in the Tennessee Code as follows:
(2)[A] person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if:

      (A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury;

17

(B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and

(C) The belief of danger is founded upon reasonable grounds.

T.C.A. § 39-11-611(b) (2014).

As the State correctly notes, and the Defendant concedes, the Defendant did not request a self-defense instruction nor did the Defendant challenge the omission in his motion for new trial. We agree with the parties that the Defendant's failure to object to the omission of the instruction and his failure to raise the issue in his motion for a new trial precludes our review of this issue, subject to our noticing "plain error." *See* Tenn. R. App. P. 3(e) (providing that "no issue presented for review shall be predicated upon error in the admission or exclusion of evidence, jury instructions granted or refused, misconduct of jurors, parties or counsel, or other action committed or occurring during the trial of the case, or other ground upon which a new trial is sought, unless the same was specifically stated in the motion for new trial. . . ."); Tenn. R. App. P. 36(a) (providing that relief is not required for a party who failed to take reasonably available action to prevent or nullify an error).

Pursuant to Rule 52(b) of the Tennessee Rules of Criminal Procedure, we have discretion to notice an error that has affected the substantial rights of an accused when necessary to do substantial justice. *State v. Adkisson*, 899 S.W.2d 626, 642 (Tenn. Crim. App. 1994). When considering whether "plain error" exists, we consider the following factors:

(a) the record must clearly establish what occurred in the trial court;

(b) a clear and unequivocal rule of law must have been breached;

(c) a substantial right of the accused must have been adversely affected;

(d) the accused did not waive the issue for tactical reasons; and

(e) consideration of the error is "necessary to do substantial justice."

*State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000) (adopting the test articulated by the Court of Criminal Appeals in *Adkisson*, 899 S.W.2d at 641-42). All five factors must be established by the record before an appellate court will recognize the existence of "plain error," and complete consideration of all the factors is not necessary when it is clear from

18

the record that at least one of the factors cannot be established. *Id.* In addition, the "'plain error' must [have been] of such a great magnitude that it probably changed the outcome of the trial." *Adkisson*, 899 S.W.2d at 642.

In the case herein we are persuaded that the Defendant has successfully carried his burden of persuasion in establishing a plain error claim. First, the record is clear as to what happened in the trial court. The jury charge is included in the record and confirms that the trial court did not instruct the jury on self-defense. Further, there is no indication in the record that the defense waived the issue for tactical reasons. During a bench conference, defense counsel argued for introduction of police reports made regarding the victim's prior threats to the Defendant as support for the defense theory that the Defendant acted in self-defense. In our view, consideration of the issue is necessary to do substantial justice. Looking at the evidence, we are convinced that the evidence "fairly raises the defense" such that the trial court would have been obligated to submit the issue to the jury. For a statutory defense to be fairly raised by the proof, "a court must, in effect, consider the evidence in the light most favorable to the defendant, including drawing all reasonable inferences flowing from that evidence," because the trial courts and appellate courts must avoid judging the credibility of the witnesses when making this determination. *State v. Shropshire*, 874 S.W.2d 634 (Tenn. Crim. App.1994).

After reviewing the record, we are persuaded that self-defense was "fairly raised" in this case. The evidence, viewed in a light most favorable to the Defendant, established that the victim, who had been drinking throughout the day, summoned the Defendant to a bar to give her a ride home. When he arrived, she was unresponsive to his requests about her specific location. When she directed him to her location, she was seated between two men who were in an aggressive stance, one of which the Defendant believed to be armed. The Defendant pulled out his gun in preparation for any conflict and then exited the building with the victim. Once outside, he put his weapon away, told the victim he was leaving, and walked toward his truck. The victim argued with him and then reached down to her ankle holster where the Defendant saw a gun. The Defendant, a trained and, by all accounts, excellent marksman, fired his gun to prevent the victim from using her gun. In doing so, he caused property damage but no physical damage to anyone. Moreover, the Defendant remained at the scene and cooperated fully when approached by authorities. His recount of the events to various persons involved with the case has remained consistent since the incident. Further, the jury's verdict of attempted voluntary manslaughter indicates the jury's belief that the Defendant acted under "adequate provocation." T.C.A. § 39-13-211(a). Thus, we conclude that, in order to do substantial justice, a jury must be properly instructed as to self-defense prior to determining whether the Defendant is guilty or not guilty. Self-defense was fairly raised by the testimony; therefore, we conclude that it should have been charged to the jury. When the proof

"tends to show" self-defense, it is error to fail to give the instruction. *Souey v. State*, 81 Tenn. 472 (1884). Because the jury was not given the benefit of the instruction and denied the opportunity to evaluate the merit of the claim, we must reverse the convictions and order a new trial.

In case of further appellate review, we now consider the Defendant's remaining issues.

## B. Exclusion of Evidence

The Defendant asserts that the trial court erred when it excluded evidence of the nature of the Defendant and the victim's relationship. Specifically, the Defendant attacks the exclusion of: (1) a 2010 email from the Defendant to the victim expressing his desire for a divorce; (2) cross-examination about the victim's prior domestic assault charge; and (3) the Defendant's testimony about the victim's violent tendencies during their marriage.

Generally, the admissibility of evidence is entrusted to the sound discretion of the trial court, and a trial court's ruling with regard to the admissibility of evidence will not be reversed on appeal absent an abuse of discretion. *State v. James*, 81 S.W.3d 751, 760 (Tenn. 2002); *State v. Carroll*, 36 S.W.3d 854, 867 (Tenn. Crim. App. 1999). "An abuse of discretion exists when the reviewing court is firmly convinced that the lower court has made a mistake in that it affirmatively appears that the lower court's decision has no basis in law or in fact and is therefore arbitrary, illogical, or unconscionable." *State v. Brown & Williamson Tobacco Corp.*, 18 S.W.3d 186, 191 (Tenn. 2000).

### 1. 2010 Email

At trial, the Defendant sought to introduce an email sent by the Defendant in October 2010 to the victim indicating he was not happy in the marriage and wanted a divorce. The trial court found the October 2010 email was not relevant and denied its admission.

The Tennessee Rules of Evidence provide that all "relevant evidence is admissible," unless excluded by other evidentiary rules or applicable authority. Tenn. R. Evid. 402. Of course, "[e]vidence which is not relevant is not admissible." *Id.* Relevant evidence is defined as evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid 401. Even relevant evidence, however, "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by

20

considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

We find no error in the trial court's ruling. The shooting occurred in April 2012, and the proffered email was sent eighteen months prior. Defense counsel argued that he wanted to introduce the email to show the parties marriage was troubled. The victim, however, had already testified to the troubled marriage at the time of these events; therefore, this testimony would have been cumulative. We find no error in the trial court's exclusion of this evidence. The Defendant is not entitled to relief as to this issue.

## 2. Victim's Prior Domestic Assault Charge

At trial, the defense attempted to cross-examine the victim about previous charges of domestic assault, and the trial court sustained the State's objection to the line of questioning.

The admissibility of evidence to establish a victim's "pertinent character trait" is governed by Rule 404(a)(2), Tennessee Rule of Evidence. This rule provides:

(a) Character Evidence Generally. Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity with the character or trait on a particular occasion, except:

. . . .

(2) Character of Victim. Evidence of a pertinent character trait of the victim of crime offered by an accused or by the prosecution to rebut the same, or evidence of a character trait of peacefulness of the victim offered by the prosecution in a homicide case to rebut evidence that the victim was the first aggressor.

The Advisory Commission Comment to this rule states that "[p]art (a) [of Rule 404] has always been the law in Tennessee for criminal prosecutions."

We note initially that, following the trial court's ruling, the Defendant did not proffer the arrest records that he wished to introduce into evidence. Thus, in addition to lacking the testimony of the victim about the charges, we do not have the arrest records themselves to review. The transcript contains some vague discussions between the State, defense counsel, and the trial court regarding the charges; however, these discussions are unclear and, of course, are not evidence. On appeal, we are simply unable to ascertain the underlying factual basis supporting the charges. Thus, we are left only to speculate as

to the precise nature of the excluded evidence. An offer of proof is necessary to "ensure effective and meaningful appellate review." *State v. Hall*, 958 S.W.2d 679, 691 n. 10 (Tenn. 1997); Tenn. R. Evid. 103(a)(2). By failing to include the excluded charges in the appellate record, the Defendant has waived review of this issue. Tenn. R. App. P. 13(c); Tenn. R. App. P. 36(a).

## 2. Defendant's Testimony about the Victim's Prior Violent Conduct

At trial, defense counsel asked the Defendant "had you had problems before where you had to call the police to come to your residence because [the victim] was out of control?" The State objected. After hearing from both parties, the trial court found the testimony was not "germane" and limited any questioning about prior incidents to two weeks before the shooting.

The Defendant argues that the trial court erred when it prevented him from testifying about the victim's "prior aggressive tendencies" and "altercations which required the [D]efendant to call the police in order to protect himself." The Defendant, however, made no offer of proof as to what the Defendant's testimony would have been, thereby preventing our ability to effectively review this issue. Therefore, the Defendant has waived our review of this issue. Tenn. R. App. P. 13 (c); Tenn. R. App. P. 36(a).

## III. Conclusion

In accordance with the foregoing reasoning and authorities, we conclude that the trial court committed reversible error when it failed to instruct the jury on self-defense, which was fairly raised by the proof. Therefore, we reverse the trial court's judgment and remand the case for a new trial.

_____
ROBERT W. WEDEMEYER, JUDGE