IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

September 6, 2017 Session

**STATE OF TENNESSEE v. COYNICK BOSWELL**

**Appeal from the Criminal Court for Shelby County**
**No. 14-00658       James C. Beasley, Jr., Judge**

_____

**No. W2016-02591-CCA-R3-CD**

_____

Following a jury trial, the defendant, Coynick Boswell, was convicted of the first-degree murder of the victim, Kadrian Woods. On appeal the defendant challenges the sufficiency of the evidence to support his conviction for premeditated murder and his request for and instruction on self-defense. Having thoroughly reviewed the record and although the evidence is sufficient to sustain the jury's verdict, we conclude that the trial court erred when it failed to instruct the jury as to self-defense. Accordingly, we reverse the judgment of the trial court and remand the matter for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Reversed;**
**Case Remanded**

J. ROSS DYER, J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and NORMA MCGEE OGLE, J., joined.

Michael R. Working, Memphis, Tennessee, for the appellant, Coynick Boswell.

Herbert H. Slatery III, Attorney General and Reporter; David H Findley, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Colin Campbell, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**Factual Background**

**1. Overview**

The defendant was convicted by a jury of first-degree murder on October 26, 2016. This case arises out of an altercation at the Eden Point Apartments in Memphis, Tennessee on August 23, 2013. The defendant confronted the victim on the stairway of

the apartment complex. The defendant, armed with a handgun, accused the unarmed victim of giving him counterfeit money. The confrontation escalated, and the defendant discharged his weapon several times. The victim was struck twice, once in the upper back and once in the abdomen. The wound in his back caused critical internal injuries from which he later died. The defendant fled the scene but was later arrested.

The defendant's trial focused primarily on the testimony of three witnesses to the confrontation. First, Brandon Sails testified that the victim had just left his apartment before encountering the defendant on the stairway. Secondly, Wardell Thomas explained he accompanied the defendant to Eden Point Apartments. Finally, Carlos Daniel, the victim's cousin, testified he was with the victim when they both left Mr. Sails' apartment. Only Mr. Thomas and Mr. Daniel were witnesses to the entire altercation, while Mr. Sails saw most of the fight through his window and open door. All three witnesses positively identified the defendant in a photo line-up and at trial as the shooter.

At the conclusion of the trial, the defendant requested an instruction on self-defense. The trial court denied the request. The jury was instructed on first-degree murder as well as the lesser included offenses of voluntary manslaughter, reckless homicide, and criminally negligent homicide. The jury found the defendant guilty of first-degree murder. The defendant moved for a new trial, which was denied. The defendant now appeals challenging the failure to instruct the jury to consider self-defense and arguing there is insufficient evidence to sustain the jury's verdict.

## 2. Witness Testimony

The State's proof consisted of testimony from the victim's mother, the responding officers, the three witnesses from the scene, and the testimony and report from the medical examiner. The victim's mother testified that her son was twenty-three years old at the time of the shooting. The first officer on the scene, Officer Matthew Dyess, testified that by the time he responded, the altercation had ended and his main role was securing the scene for the other officers who were arriving. The State called each of the three eyewitnesses to testify to their recollection of the events.

### A. Brandon Sails

Mr. Sails testified that on the night of the shooting, the victim was in Mr. Sails' apartment "for maybe fifteen to twenty minutes." Mr. Daniel arrived about a half-hour before the victim. Mr. Sails testified that the victim and Mr. Daniel left the apartment together and that he could view them through the open blinds in the living room window and through his open door. Mr. Sails noted that the victim was not armed when he left the apartment. As the victim was leaving, Mr. Sails saw two men ascending the stairs

towards Mr. Daniel and the victim, one of whom he recognized as Mr. Thomas. Mr. Sails saw Mr. Thomas and Mr. Daniel shake hands and then immediately heard two gunshots. He then heard the victim shout, "What's up with you bro?" Mr. Sails testified he heard nothing spoken between the parties prior to hearing the shots. Mr. Sails stated he saw the defendant gesture to something at his side during the confrontation. The following exchange took place between Mr. Sails and the State when he was asked about the gesture:

> State: Prior to that gesture, did you see [the victim] use any violence against the person that made that gesture?
>
> Mr. Sails: I saw [the victim] charge the person who made the gesture as intent to not let him get whatever it was that he gestured at his waist side for.
>
> Sate: Prior to that charge, did you see [the victim] use any violence against that person?
>
> Mr. Sails: It was -- it looked like in defense. Because the way [the victim] said, What's up with you, Bro, it was a scared intent, like he had been shocked or something.
>
> State: I guess my question is: Did you see him -- did you ever see -- prior to the gesture, and you just testified that [the victim] is moving towards this person as he's making the gesture, did you see [the victim] punch this person prior to him going towards him?
>
> Mr. Sails: No, sir.
>
> State: Okay. Did you see [the victim] push [the defendant]? Did you see [the victim] injure [the defendant] or anything like that?
>
> Mr. Sails: No, sir.
>
> State: Which happened first, the gesture towards the hip or [the victim] coming at this person?
>
> Mr. Sails: The gesture at the hip.
>
> State: Happened first?

Mr. Sails: Yes, sir.

Through the window, Mr. Sails saw the victim and the defendant "wrestling," at which point Mr. Sails retreated further back into his apartment. Mr. Sails then heard one last shot, after which he made his way back to the door and looked outside his apartment. When he looked out of his apartment, Mr. Sails saw the victim lying on the ground and wounded. Mr. Sails testified he later identified the defendant in a photo line-up as the shooter.

Upon cross-examination, Mr. Sails testified that while the defendant and the victim were wrestling, their hands were interlocked. At this point, the victim had the defendant pressed against the rail. According to Mr. Sails, had the victim pushed the defendant over the rail the defendant would have fallen two stories "to the bottom." Mr. Sails clarified that the defendant was not in a "back-bend tilt" over the rail, but only a semi-tilt. After seeing the defendant pressed against the rail, Mr. Sails testified he heard one last shot before everyone involved in the incident "ran off." Mr. Sails confirmed on redirect examination that he heard four shots before seeing the defendant and the victim wrestling by the rail prior to the final shot.

B.  Wardell Thomas

Mr. Thomas testified that he and the defendant arrived at the Eden Point Apartments in the early evening on August 23, 2013. Mr. Thomas knew the defendant was armed when they left for the apartments. He stated they normally keep guns on themselves for protection. The defendant had the gun tucked into the waist of his pants, under his shirt.

Mr. Thomas stated that as he and the defendant climbed the steps to Mr. Sails' apartment, they encountered the victim and Mr. Daniel leaving the apartment. The victim asked if they wanted to gamble, but the defendant refused because the victim had given him forty dollars in counterfeit money three weeks prior. The situation then escalated when the victim pulled up his pants and the defendant did the same, showing he was armed with a revolver. The victim asked, "You got a gun?" The defendant replied, "I just want my money." Mr. Thomas saw the victim start towards the defendant. The defendant put up his hands and said "you ain't got to walk up on me like that." Mr. Thomas testified the victim saw and "went for the gun," but "[the defendant] got it from him." According to Mr. Thomas, the defendant had control of the weapon. At that point, the gun "went off", and Thomas ran down the steps and away from the fight. Mr. Thomas testified he heard four or five more shots after he fled the scene.

- 4 -

Mr. Thomas admitted his initial statement to police differed from his courtroom testimony. After the incident, Mr. Thomas initially stated, "[the victim] pulled his pants up at him, then [the defendant] tried to defend himself by pushing him off. Then [the defendant] was reaching for his gun while [the victim] was trying to rush him. Then the gun went off . . . ." Contrastingly at trial, Mr. Thomas stated "[the victim] must have seen the gun" and gone for it. Mr. Thomas confirmed he heard the defendant say to the victim "You got me [f**ked] up" at the beginning of the confrontation. When asked what that phrase meant, Mr. Thomas clarified that it meant the defendant was accusing the victim of having cheated him. On redirect, Mr. Thomas confirmed the defendant reached for his gun while the victim was advancing on him. After the shooting, Mr. Thomas spoke to the defendant on the phone. During the conversation, the defendant was "paranoid" and wanted to get his and Mr. Thomas' "stories straight."

C. Carlos Daniel

Mr. Daniel testified he arrived at Mr. Sails' apartment in the afternoon on August 23, 2013, and the victim arrived as it was "getting dark." Mr. Daniel stated he and the victim left Mr. Sails' apartment shortly after the victim's arrival. As he opened the door, Mr. Thomas was just outside. As the victim began to leave, Mr. Daniel saw the defendant coming up the steps. Daniel heard the defendant say: "You got me [f**cked] up." Mr. Daniel testified that when he heard this statement, he had just stepped off the landing outside the apartment, and the victim was behind him on the landing at the top of the steps.

The defendant continued up the steps passing Daniel and shouting at the victim, "you got me [f**cked] up, you got me [f**cked] up." Mr. Daniel testified the defendant accused the victim of passing him counterfeit money. When the victim attempted to walk past the defendant on the steps, the defendant "bumped" him back up a step. Mr. Daniel testified the victim then pulled up his pants, and the defendant almost instantly drew and fired his weapon. Mr. Daniel stated the bullet ricocheted, and the defendant was attempting to raise his weapon but could not because the defendant and the victim were wrestling for control of the gun. Mr. Daniel clarified that it was the victim who grabbed the defendant "when the gun came up" because the defendant "tried to shoot [the victim] with the gun."

Mr. Daniel testified that after the defendant and victim began wrestling with each other the fight continued up the stairs towards the railing. Mr. Daniel stated that during the fight the gun went off "five or six" times. Mr. Daniel testified that when the fight reached the railing on the balcony, the victim slipped and fell to the ground. Mr. Daniel stated that while the victim was attempting to stand back up, the defendant fired the weapon into the victim's back at close range. Mr. Daniel retreated into Mr. Sails'

apartment after the first shots and watched the fight from the open door of the apartment. Mr. Daniel testified that Mr. Thomas and the defendant fled after the last shot. Mr. Daniel confirmed that he later identified the defendant in a photo line-up as the shooter.

On cross-examination, Mr. Daniel explained that as the fight began both the victim and the defendant "bumped" each other. Mr. Daniel saw the victim pull up his pants as he tried to get past the defendant, and at that point, the defendant pulled his weapon and began firing. Mr. Daniel stated that when the first shot was fired only the defendant's hand was on the weapon. When asked repeatedly if the victim ever had his hand on the weapon, Mr. Daniel confirmed that throughout the entire fight, only the defendant had control of the weapon. Mr. Daniel testified that towards the conclusion of the fight the defendant had overpowered the victim, who had slipped down against the railing, and that is when the defendant shot the victim in the back. When questioned about why his testimony was different than Mr. Sails' account, Mr. Daniel explained: "[Mr. Sails] didn't see everything I saw. I saw everything. I was out there when everything went on. He was in the house. They was still in the house with the music on and playing the game." Mr. Daniel stated he never saw the defendant being pushed over the railing.

### 3. Medical Examiner's Testimony and Jury Instruction

The State called Dr. Karen Chancellor, the chief medical examiner for Shelby County, as its last witness. Dr. Chancellor, an expert in the field of forensic pathology, testified to her findings after conducting the victim's autopsy. She explained the manner of death was due to multiple gunshot wounds. Dr. Chancellor noted the victim suffered two gunshot wounds which she labeled "Number 1" and "Number 2." She clarified that the numbering of the wounds was only organizational, not indicative of which was inflicted first. Based on her examination, it was not possible to determine the order in which the wounds were inflicted.

Dr. Chancellor testified to the details of gunshot "Number 1" stating "gunshot wound number one [was] on the right side of the upper back, it fractured a posterior part of a right rib to enter the chest cavity. It went through the right lung, the liver, the inferior vena cava and the pancreas." She testified that the wound caused severe internal bleeding and, absent immediate medical care, would have caused unconsciousness in under a minute and death within a few minutes.

Dr. Chancellor stated that based on the stippling around the wound, gunshot "Number 1" was inflicted from "two to three feet" from the victim's back. She stated this was only an estimate because the victim's shirt was not available for examination, and it was possible the gun could have been closer. Dr. Chancellor testified that the gun

would be firing downward towards the victim, but absent more information it would not be possible to determine the exact position of the gun and the victim.

Dr. Chancellor testified that gunshot "Number 2" entered the front of the body "just beneath the rib cage." Her examination determined gunshot "Number 2" entered "the abdomen . . . [and] caused injury of the transverse colon. It perforated the small intestine multiple times. It went through the urinary bladder, entered the left buttock, and lodges in the medial aspect of the muscular tissues of the left thigh." Dr. Chancellor noted this wound could potentially have been fatal, but not immediately, and a victim could have survived this wound.

Dr. Chancellor stated the entry wound for gunshot "Number 2" was inflicted from about "one to six inches" from the victim's body. When asked on cross-examination about the range of the gun from the body, Dr. Chancellor testified that without additional information it would be impossible to determine an exact number within the given range. She stated the powder stippling indicated the gunshots could have been inflicted from slightly further away, but it was more likely to have been closer.

The State rested after Dr. Chancellor's testimony. After the defendant rested, the defendant moved the trial court to charge the jury with a self-defense instruction. The trial court denied the motion stating there was not enough evidence to support self-defense. The trial court noted the testimony indicated "that from the beginning . . . the defendant was the more aggressive" party. The jury returned a verdict of guilty on the charge of first-degree murder.

## Analysis

The defendant appeals his verdict to this Court challenging the sufficiency of the evidence supporting first-degree murder and the trial court's failure to instruct the jury on self-defense. The defendant argues the State failed to provide sufficient evidence to support premeditation. The State argues there is sufficient evidence to support the jury's finding of premeditation. The defendant also claims the trial court should have instructed the jury on self-defense arguing the defendant shot the victim to avoid being thrown from the balcony. The State argues that the defendant's initial aggression and escalation of the altercation does not entitle him to a self-defense instruction. Upon our thorough review of the record, we agree with the defendant and reverse the judgment the trial court.

### 1. Jury Instruction for Self-Defense

The Tennessee Supreme Court has established that "sufficient evidence to fairly raise a general defense 'is less than that required to establish a proposition by a

preponderance of the evidence.'" *State v. Self*, No. E2014-02466-CCA-R3-CD, 2016 WL 4542412, at *59 (Tenn. Crim. App. Aug. 29, 2016), *perm. app. denied* (Jan. 19, 2017), *cert. denied*, 137 S. Ct. 2224 (2017) (quoting *State v. Hawkins*, 406 S.W.3d 121, 129 (Tenn. 2013)). The trial court must consider the evidence in the light most favorable to the defendant and draw all reasonable inferences in the defendant's favor. *Id.* If the evidence at trial fairly raises a general defense, the trial court is required to provide the jury with the appropriate instruction. *Id.* The trial court's determination of whether to give or withhold a jury instruction is a mixed question of law and fact that this Court reviews *de novo* without a presumption of correctness. *Id.*

Relevant to the issue here, Tennessee Code Annotated section 39-11-611(b) explains that a person acts in self-defense when the person:

> is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if:
> (A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury.
> (B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and
> (C) The belief of danger is founded upon reasonable grounds.

Tenn. Code. Ann. § 39-11-611(b)(2)(A)-(C). Additionally, the threat or use of force against another is not justified "if the person using force provoked the other individual's use or attempted use of unlawful force unless, "[t]he person using force abandons the encounter or clearly communicates to the other the intent to do so; and the other person nevertheless continues or attempts to use unlawful force against the person." Tenn. Code Ann. § 39-11-611(e)(2)(A-B).

After reviewing the record, we are persuaded that self-defense was "fairly raised" in this case. While two of the three eyewitnesses, Mr. Daniel and Mr. Sails, testified that the defendant was the primary aggressor, reaching for his gun, which caused the victim to react in self-defense, Mr. Thomas' testimony seems to call their assessment into question. Specifically, on cross-examination, Mr. Thomas testified that the victim "pulled his pants up as in with aggression" and started "coming towards [the defendant]." In turn, the defendant reacted by "[throwing] his hands up like, Hold up." The victim then, either because he knew the defendant had a gun or because he saw the gun in the defendant's waist band, reached for the defendant's gun. Despite being questioned on re-direct examination about his testimony differing from his initial statement to police, Mr. Thomas consistently testified that the victim "rushed" the defendant and reached for the defendant's waistband and gun.

Based on the differences between the eyewitness accounts of Mr. Thomas, Mr. Sails, and Mr. Daniel, this case presented a question of fact as to whether the defendant or the victim was the primary aggressor. Mr. Sails' and Mr. Daniel's testimony painted a picture that the defendant pulled a gun on the victim, and the victim responded in self-defense. However, viewed in a light most favorable to the defendant, Mr. Thomas' testimony seems to suggest that the victim was the primary aggressor, reaching for the defendant's gun which caused the defendant to act in self-defense. Resolution of that issue was one the jury should have determined after having been properly instructed on the law of self-defense prior to determining whether the defendant is guilty or not guilty. When the proof "tends to show" self-defense, it is error to fail to give the instruction. *Souey v. State,* 81 Tenn. 472 (1884). Because the jury was not given the benefit of the instruction and denied the opportunity to evaluate the merit of the claim, we must reverse the convictions and order a new trial.

## 2. Sufficiency of the Evidence to Support First-Degree Murder.

When the sufficiency of the evidence is challenged, the relevant question for the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190-92 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *See State v. Pappas*, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). Our Supreme Court has stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977); *Farmer v. State*, 343 S.W.2d 895, 897 (Tenn. 1961)). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008) (citing *Byrge v. State*, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence and the inferences to be drawn from this evidence and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury. *Dorantes*, 331 S.W.3d at 379 (citing *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006)). This Court, when considering the sufficiency of the evidence, shall not reweigh the evidence or substitute its inferences for those drawn by the trier of fact. *Id.*

At trial, the State was required to prove beyond a reasonable doubt that the defendant intentionally and with premeditation killed the victim. Tenn. Code Ann. § 39-13-202(a)(1). "'Intentional' refers to a person who acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-302(a). A premeditated act is one done after the exercise of reflection and judgment, and the intent to kill must have been formed prior to the act. Tenn. Code Ann. § 39-13-202(d). "It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time." *Id.* To be capable of premeditation, however, the accused must have been sufficiently free from excitement and passion. *Id.* The existence of premeditation is a question of fact for the jury to determine based on a consideration of all of the evidence. *See State v. Suttles*, 30 S.W.3d 252, 261 (Tenn. 2000). Premeditation may be inferred from the circumstantial evidence surrounding the crime, including the manner and circumstances of the killing. *See State v. Pike*, 978 S.W.2d 904, 914 (Tenn. 1998); *State v. Addison*, 973 S.W.2d 260, 265 (Tenn. Crim. App. 1997).

The State provided the following proof to support a finding of first-degree murder. The State presented testimony from three eyewitnesses who identified the defendant as the shooter. This testimony was supplemented by the fact that, shortly after the crime, each eyewitness identified the defendant in a photo lineup. The State provided further testimony that the defendant fired at least two shots, one into the defendant's back. Additionally, the State provided the report of the medical examiner which stated the gunshots caused the victim's death. Based on our review of the proof presented, the evidence is sufficient to establish that the defendant intentionally killed the victim.

The defendant, however, argues the State failed to meet its burden establishing premeditation. The Tennessee Supreme Court has further explained premeditation as follows:

> The elements of premeditation and deliberation are questions for the jury which may be established by proof of the circumstances surrounding the killing. There are several factors which tend to support the existence of these elements which include: the use of a deadly weapon upon an unarmed victim; the particularly cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime; and calmness immediately after the killing.

*State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997) (internal citations omitted). However, *State v. Bland* does not include an exhaustive list of factors for consideration when finding premeditation. *State v. Adams*, 405 S.W.3d 641, 663 (Tenn. 2013). A conclusion the killing was premeditated may also be supported by the nature of the killing or evidence establishing a motive. *Id.* Likewise, lack of provocation by the victim, failure to render aid, and destruction or secretion of evidence may also support an inference of premeditation. *State v. Larkin*, 443 S.W.3d 751, 815-16 (Tenn. Crim. App. 2013) (internal citations omitted). Finally, the firing of multiple shots can allow a jury to infer premeditation. *State v. Halake*, 102 S.W.3d 661, 669 (Tenn. Crim. App. 2001) ("Additionally, in the instant case the victim was shot multiple times, which although not indicative of premeditation when considered by itself, can be considered as evidence of premeditation in addition to other proof of premeditation.")

The defendant argues there are insufficient facts to support the circumstances outlined in *Bland*. The defendant argues only the preexisting dispute between the defendant and the victim over the counterfeit forty dollars points to potential premeditation. The defendant further argues the decision to be armed when he and Mr. Thomas traveled to Eden Point Apartments was based on personal security, not premeditation, given the dangerous nature of the neighborhood. The defendant notes he

made no declaration of intent to kill the victim and the encounter at the Eden Point Apartments occurred by chance. Finally, the defendant argues he shot the victim to prevent the victim from throwing him from the balcony.

Upon our review of the record, the State satisfied its burden establishing premeditation. The State provided testimony that the victim hiked his pants, displaying to the defendant he was not armed. *See Bland*, 958 S.W.2d at 660. Additionally, the State presented eyewitness testimony that the defendant did not render aid and fled immediately after the final shot was fired. *See Larkin*, 443 S.W.3d at 815-16. The jury heard facts that indicate the defendant fired at least four shots during the altercation with the victim. *See Halake,* 102 S.W.3d at 669. Additionally, Mr. Daniel testified the defendant shot the victim in the back after he had stumbled during the fight. *Cf. State v. Daniels*, No. M2015-01939-CCA-R3-CD, 2017 WL 1032743, at *8 (Tenn. Crim. App. Mar. 16, 2017) (citing *Bland*, 958 S.W.2d at 660) (explaining that a shot from behind is sufficient to support a finding of premeditation). These facts, in concert with the defendant's concession of the preexisting dispute between the defendant and victim, are sufficient to support a jury's determination of premeditation. The defendant, therefore, is not entitled to relief on this issue.

## Conclusion

Based on the foregoing authorities and reasoning, the judgment of the trial court is reversed and the matter is remanded for a new trial.

_____
J. ROSS DYER, JUDGE